94 N.J. Super. 110 (1967)
226 A.2d 854
CHANEL INC. AND CHANEL INDUSTRIES, INC., PLAINTIFFS,
v.
CASA FLORA COMPANY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided February 6, 1967.
*112 Messrs. Levy, Lemken & Margulies, attorneys for plaintiffs (Mr. Seymour Margulies, appearing).
Messrs. Milton M. and Adrian M. Unger, attorneys for defendant (Mr. Milton M. Unger, appearing).
HERBERT, J.S.C.
Plaintiff Chanel Industries, Inc. manufactures and plaintiff Chanel Inc. markets eau de cologne known by the trade-mark "Chanel No. 5." Relief by injunction is sought against defendant, a company which admits buying Chanel No. 5 cologne from sellers other than either of the plaintiffs, and admits rebottling it in small vials which in due course reach the counters of retailers.
The Chanel No. 5 cologne which defendant buys is contained in plaintiffs' bottles. The vials into which it is then placed are labelled:
 "REBOTTLED
 CHANEL NO. 5
 EAU DE COLOGNE
 Rebottled by an
 independent bottler
 from the
 genuine product
 wholly independent
 of CHANEL
 Casa Flora Co.
 Bloomfield, N.J.
 1 Dram"
The first three lines of this label are in capital letters and the type used is larger than that used in the rest of the label. *113 What is not shown here  because of a typewriter's limitations  is a heavier type face and small capitals in the final three lines.
Defendant contends that it is entitled to purchase Chanel No. 5 cologne from anyone who is the legitimate owner of a supply and is willing to make a sale, and that rebottling and distribution by it are not improper if no misrepresentations are made. Defendant goes on and contends that its vials are so labelled as to make clear to anyone who is willing to read that plaintiffs' product has been placed in the vials by the defendant and not by either plaintiff. Plaintiffs assert that defendant should not be permitted to rebottle their product without their permission and, in any event, has not made clear to the public what it is doing. They also claim they are entitled to relief on the basis of R.S. 56:3-1 through 13, as amended, being a group of statutory sections dealing with registration of trade-marks and protection of rights conferred by registration; on the basis of the New Jersey bottle law, R.S. 56:3-14 et seq., as amended, and on the basis of R.S. 56:4-1 et seq., as amended.
Counsel have not been able to cite any New Jersey cases which have dealt with repackaging of a trade-marked product by a business man who has not been given permission to do so by one owning or controlling the mark; and I have not found any. The leading case on the subject is Prestonettes, Inc. v. Coty, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). Coty sued to restrain alleged unlawful uses of registered trade-marks for powder and perfume. Among other things, the proofs showed that Prestonettes, Inc. had been doing what defendant here admits to, namely, buying genuine Coty perfume in larger bottles and selling it in smaller bottles. The District Court ruled that Prestonettes could continue repackaging and selling Coty's products if it used an appropriate label. The Circuit Court of Appeals took a radically different view and enjoined Prestonettes from using the Coty mark or name at all, except on original packages as marked and sold by plaintiff. Then the Supreme *114 Court, with one dissenting vote, reversed the Circuit Court of Appeals and went back to the judgment of the District Court. Justice Holmes said for the court:
"The defendant of course by virtue of its ownership, had a right to compound or change what it bought, to divide either the original or the modified product, and to sell it so divided. The plaintiff could not prevent or complain of its stating the nature of the component parts and the source from which they were derived if it did not use the trade-mark in doing so. For instance, the defendant could state that a certain percentage of its compound was made at a certain place in Paris, however well known as the plaintiff's factory that place might be. If the compound was worse than the constituent, it might be a misfortune to the plaintiff, but the plaintiff would have no cause of action, as the defendant was exercising the rights of ownership and only telling the truth. The existence of a trade-mark would have no bearing on the question. Then what new rights does the trade-mark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright. The argument drawn from the language of the Trade-Mark Act does not seem to us to need discussion. A trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his." (264 U.S., at p. 368, 44 S.Ct., at p. 351)
Prestonettes was followed in Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), a case which involved both trade-mark and unfair competition questions. Defendants had been reconditioning used spark plugs and selling them. It was held that Champion, the trade-mark owner, had no right to an injunction against sale of the reconditioned plugs, but a decree was affirmed which required clear disclosure to the buyer of the reconditioning and that defendants rather than Champion were doing it.
Judge William Clark, in Bourjois, Inc. v. Hermida Laboratories, 106 F.2d 174 (3 Cir. 1939), cited some text writers to the effect that the owner of a trade-mark should be entitled to insist that his product be sold exclusively in his own package, but the case resulted in a judgment allowing Hermida to continue selling its own packages of plaintiff's face powder, though under a drastically revised label. Other cases *115 which have applied the Prestonettes rule are: Bayer Co., Inc. v. Shoyer, 27 F. Supp. 633 (D.C. Pa. 1939); Forstmann Woolen Co. v. J.W. Mays, Inc., 89 F. Supp. 964 (D.C.N.Y. 1950), and Forstmann Woolen Co. v. Murray Sices Corp., 144 F. Supp. 283 (D.C.N.Y. 1956). Cf. Bulova Watch Co. v. Allerton Co., 328 F.2d 20 (7 Cir. 1964); A. Bourjois & Co., Inc. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464, 26 A.L.R. 567 (1923), and Guerlain, Inc. v. F.W. Woolworth Co., 297 N.Y. 11, 19, 74 N.E.2d 217 (Ct. App. 1947), certiorari denied 332 U.S. 837, 68 S.Ct. 220, 92 L.Ed. 410 (1947). Although it can be said about the two Forstmann cases that the trade-marked cloth there involved was intended to be cut and fashioned into garments by a purchaser, nevertheless those cases support the proposition that ownership legitimately acquired carries with it the right to offer the product for resale coupled with a representation that it is in fact the trade-marked product and has been reformed, processed or repackaged by another.
There can be no doubt that the small vials being marketed by defendant in this case are made readily salable by the customer's belief that they contain plaintiffs' well-known cologne. Thus, defendant is getting to a considerable extent the benefit of the reputation which plaintiffs have established for their product, but wholesalers and retailers who sell that product in plaintiffs' own bottles are getting a similar benefit and, like those dealers, defendant is in fact marketing Chanel cologne purchased in the avenues of trade where plaintiffs placed it for the very purpose of having it bought.
From the authorities cited I conclude that plaintiffs, owning and controlling a trade-mark, are not by virtue of that ownership and control to be granted an injunction barring defendant from buying, rebottling and selling in its own bottles the trade-marked cologne.
The sale of the rebottled product under conditions amounting to unfair competition would be another matter, and that leads to a consideration of defendant's labels and advertising. The text of the label on defendant's one-dram vials has *116 already been quoted. Defendant also has prepared various other devices to attract a shopper's attention. There is a small display card about 4" x 6" to which a vial is attached. The card bears essentially the same text as the label on the vial, plus some decoration. At the top of the card in 18-point type is the legend "REBOTTLED CHANEL NO. 5." Defendant also uses a small box which serves as a mounting and display device for a vial. The printing on that box is almost identical with the quoted label, and again the words "CHANEL NO. 5 REBOTTLED" are the most prominent part of the reading matter. Both card and box state that the rebottling has been done "by an independent bottler from the genuine product wholly independent of Chanel," and the name of defendant appears on all of the advertising matter. There was also placed in evidence a larger advertising sheet about 8 1/2" x 11" showing that three other brands of cologne as well as Chanel No. 5 are being rebottled and sold in one-dram vials. This sheet also makes it plain that the cologne in the vials has been rebottled "wholly independent of the original makers."
Although defendant does not sell at retail  nor do plaintiffs  the advertising material just described is furnished to merchants for use on their racks and counters. Defendant's label and advertising material do not bear any facsimile or imitation of a distinctive trade-mark; in that respect this case differs from Bayer Co., Inc. v. Shoyer, supra, where Bayer's design and coloring reproduced on Shoyer's packages led to injunctive relief. In fact, plaintiffs do not use as part of their mark any abstract or representational design. The word "Chanel" is printed on plaintiffs' bottles and boxes in conventional type face. On the bottle the label is: "No. 5 Chanel," and on the box "Chanel No. 5." One distinctive, though scarcely noticeable feature of the label, not reproducible with an ordinary typewriter, is placement of the "o" in "No" opposite the top of the "N" rather than on the base line. And the conventional period after an abbreviation is missing. These minor distinctions are not imitated by defendant, *117 however. Its label and advertising place the "o" in the usual position, followed by a period: "Chanel No. 5"
I am satisfied that defendant's label and advertising material are sufficient. To inform in fact every member of the buying public would be an impossible task, but within practical limits of communication defendant is telling prospective customers that what is being offered to them is rebottled Chanel No 5 and that the rebottling was done by defendant and not by the plaintiffs.
I now turn to several New Jersey statutes on which plaintiffs rely. The theme of their argument is that these enactments, or some or one of them, furnish a basis for injunctive relief against defendant, which basis exists independently of any rules of case law or other legislation. The initial question is whether any of the statutes in question applies to the facts of this case.
R.S. 56:4-1 and 2 provide for an injunction to protect branded or trade-marked products against certain specified practices "except where such products do not carry any notice prohibiting such practices * * *." Plaintiffs' packages and bottles do not carry any such notice, an omission which leaves them beyond the effect of the statute and which makes it unnecessary to inquire here whether the defendant's activities are among the practices specified. N.J.S.A. 56:4-3 through 6, generally called the Fair Trade Act, is also inapplicable. A contract between one of the plaintiffs and a New Jersey druggist was put in evidence. It would furnish a base, apparently, for a suit under the statute to restrain the cutting of retail prices on Chanel perfumery. Plaintiffs' published schedule of minimum resale prices contains a number of entries relating to various bottle sizes of cologne, but the cologne section ends with this language:
"If sold by the ounce or smaller quantity: 1 ounce or any fraction thereof [$] 2.00"
If this were a suit under the statute against a merchant charged with selling defendant's one-dram vials at retail for less than $2, it would be necessary to decide whether New *118 Jersey should or should not enjoin, as New York did in Guerlain, Inc. v. F.W. Woolworth Co., supra, but that problem is not involved here. Defendant does not sell its vials of Chanel cologne at retail and its sales are not subject to whatever price schedule plaintiffs are in a position to require retailers to comply with.
Another statute relied upon by plaintiffs was adopted in 1898 and contains provisions for registration with the Secretary of State of labels, trade-marks, terms or designs used or to be used to distinguish products. R.S. 56:3-1. It was superseded on January 1, 1967 (N.J.S.A. 56:3-13.1 et seq., L. 1966, c. 263), but in the new act is a section (15) preserving the effectiveness of the old legislation as to all pending suits. The act of 1898 provides that a registered "label, trade-mark, term or design" shall be the property of the registrant; that counterfeiting and imitating and use of counterfeits and imitations are forbidden, and that "any use whatever of any such genuine label, trade-mark, term or design, without first obtaining * * * the license, consent or authority" of the owner, shall be unlawful. R.S. 56:3-2 and 7 and 8. The last of these sections has in it two subsections making it unlawful to
"b. Have any such genuine label, trade-mark, term or design in possession with intent that the same shall be used, sold, offered for sale or displayed, or that the same shall be applied, attached or displayed in any manner whatever to or on any goods, wares or merchandise; or
c. Sell, offer to sell, or dispose of or have in possession with intent that the same shall be sold or disposed of, any goods, wares or merchandise in any box, case, can or package to or on which any such genuine label, trade-mark, term or design of any such person, association, organization, or corporation is attached, affixed, or displayed; * * *."
Taken literally, the quoted language appears to prohibit the use of a genuine mark on the genuine product to which it relates, and the sale of a manufacturer's goods in his own containers bearing his own mark, unless  as indicated elsewhere in section 8  a license, consent or authorization has *119 previously been obtained. I doubt that these subsections should be construed to give them such a meaning. If given such a meaning, most of our retailers must be violating the law, being without any license, consent or authority from the trade-mark owner whose goods they are selling in original containers, except such authorization as can be implied from the fact that the goods have been released into the normal currents of trade. A sensible construction of the quoted subsections would be one making them applicable to use of a genuine mark on non-genuine goods or on containers filled with a substitute for the trade-marked product. If it could be said in the present case that defendant has been using the genuine trade-mark of plaintiffs, then my construction of the quoted subsections would make them inapplicable because defendant's vials have contained Chanel cologne.
There are also other reasons why I think R.S. 56:3-1 et seq., as amended, does not apply. Defendant is not using plaintiffs' trade-mark in any imitative or counterfeiting sense; defendant is using, in the form of conventional print, the name which plaintiffs have given to their product and by which the public knows it. To call the contents of the vial by any other name would be less than accurate and perhaps misleading. In addition, there is a strong case to be made for the proposition that a mark owner who sells his product at a wholesale level, knowing that it will be sold and resold before reaching the consumer, has given, by implication at least, authority for use of the mark to every businessman in the chain of distribution. Use of such implied authority would, of course, be subject to principles of unfair competition already discussed, but any question about the applicability of this statute to the present case is eliminated, in my opinion, by authorization from plaintiffs, express or implied, to use their trade-mark to describe their product in a way which does not conceal how and by whom it has been put into its saleable form, and does not otherwise mislead. Moreover, plaintiffs have done something more than put Chanel cologne into the current of trade. Their published price schedule lists *120 four specified bottle sizes of cologne, provides retail prices for each, and then says, "if sold by the ounce or smaller quantity, 1 ounce or any fraction thereof. [$] 2.00" I think plaintiffs thus have shown that they contemplate sales of their cologne in containers smaller than any of the bottles leaving their plant, which necessarily presupposes rebottling by someone.
Plaintiffs also rely on the New Jersey bottle law. R.S. 56:3-14 et seq., as amended. This provides for registration of a "name, mark, or device" which is "branded, stamped, engraved, etched, blown, embossed, impressed or otherwise produced" upon containers for a long list of specified products including perfumes. Plaintiffs' bottles have the name "Chanel" blown into the glass. There is also a paper label, and the name "Chanel, Inc." appears on the bottle in small, slightly raised, black letters which appear to be composed of enamel. I have no doubt that plaintiffs' bottles fall within the bottle law, and no question has been raised about the sufficiency of registration under that law. A reading of the law, however, makes it clear that it is designed to prevent traffic in used containers which bear registered names, marks or devices. Although N.J.S.A. 56:3-20 contains language which might be read as a prohibition against putting perfume, or any of the other products listed in section 15, into a new container (i.e., previously unused) which bears in any form the trade-mark of the product, my conclusion is that the entire statute applies to plaintiffs' operations only to the extent of forbidding others from refilling plaintiffs' own bottles. The statute does not apply to defendant's activities because defendant is using plaintiffs' bottles only to receive a supply of Chanel cologne and then empties those bottles in its own plant so that their contents may be rebottled in defendant's vials.
Plaintiffs sought to prove at the trial that defendant is not filling its vials with pure Chanel No 5 cologne. An expert witness was produced who testified that he was given one of plaintiffs' bottles of cologne and one of defendant's *121 vials. He then used a gas chromatograph on a sample from each container. The device, he said, indicated substantial differences between the two samples. Opposed to this testimony were the statements of the proprietor of defendant that the entire process in defendant's plant consists of transferring contents of genuine Chanel bottles into defendant's vials. He denied emphatically that any substitute material is used and that any adulteration takes place. He impressed me as a truthful witness.
A gas chromatograph is a device for testing likenesses or differences between samples of any compound which lends itself to the process. I have rejected the results of the gas chromatograph in this case. There was no proof whatever that Chanel No 5 cologne is a uniform product. I will assume that its commercial success depends upon the buyer's getting with each new purchase substantially the odor and the consistency which she is accustomed to, but there is nothing in the record to show that plaintiffs do not have a choice of ingredients to produce such results. In short, there is no proof here that Chanel No 5 cologne is a compound which is always blended to a precise formula.
Judgment will be entered in favor of defendant and against plaintiffs. Costs are allowed.